# In the United States Court of Federal Claims

No. 18-272C
(Filed: June 14, 2018)
(Re-filed: June 29, 2018)[1]

* * * * * * * * * * * * * * * * * * * *

QUANTUM RESEARCH INTERNATIONAL, INC.,

      *Plaintiff,*

v.

THE UNITED STATES,

      *Defendant,*

  and

TORCH TECHNOLOGIES, INC.,

      *Intervenor.*

* * * * * * * * * * * * * * * * * * * *

Bid protest; post-protest corrective action; 28 U.S.C. § 1491(b)(1) (2012); instructions in request for quotation; unequal evaluation.

*Jon Davidson Levin*, Huntsville, AL, for plaintiff.

*Michael Duane Austin*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

*Robert J. Symon*, Washington, DC, for intervenor.

## OPINION

BRUGGINK, *Judge*.

    This is a post-award bid protest by Quantum Research International, Inc. ("Quantum"), of the Army's post-protest corrective action in which it

---

[1] This opinion was originally issued under seal. The parties offered joint proposed redactions. We adopt the proposed redactions because we find them to be appropriate. Those redactions are indicated herein with brackets.

awarded a task order to Torch Technologies, Inc. ("Torch"), through Task Order Request for Quote 2016T-12. Quantum was the incumbent on the previous contract. Torch appears as intervenor.

The parties have filed cross-motions for judgment on the administrative record. The matter is fully briefed, and we held oral argument on June 7, 2018. Because the Army did not act arbitrarily or capriciously, abuse its discretion, or otherwise act in violation of the law, we grant defendant's and intervenor's cross-motions for judgment on the administrative record and deny plaintiff's motion.

BACKGROUND

On August 31, 2016, the U.S. Army Contracting Command—Redstone, Redstone Arsenal, Alabama ("the Army"), issued Task Order Request for Quotation 2016T-12 ("TORFQ") to all express technical domain contractors as a total small business set-aside. The Army sought engineering, system engineering, test, and technical support for communications, navigation, and mission planning systems within Product Director—Aviation Networks and Mission Planning ("PD ANMP").[2] The Army amended the TORFQ on September 15, 2016. The TORFQ contemplated the award of a time and materials, cost reimbursement task order with a 12-month base period and four 12-month options.

The Evaluation Criteria provided, "Award will be made to the Offeror whose quotation provides the best value to the Government based upon evaluation of all submitted quotations using the [evaluation criteria] and a tradeoff process." Administrative Record ("AR") 40. "'Best value' means the expected outcome of the acquisition that, in the Government's estimation,

---

[2] PD ANMP manages acquiring and supporting avionics equipment for the Aviation Systems Project Management Office under the Program Executive Office, Aviation. The Aviation and Missile Command Expedited Professional and Engineering Support Services ("AMCOM EXPRESS") is a Blanket Purchase Agreement program that utilizes the General Service Administration Federal Supply Schedule contractors to acquire services in four domains: business and analytical, logistics, programmatic, and technical. These Blanket Purchase Agreements are "multiple-award task order type contract vehicles with provisions for time (labor hours at a fixed rate) and material, travel, and other direct costs (ODCs) on a cost reimbursement basis." AR 531.

provides the greatest overall benefit in response to the requirement (FAR 2.101)." *Id.* The agency was permitted to "accept other than the lowest priced quotation, where the decision is consistent with the evaluation criteria and the Government reasonably determines that the perceived benefits of a higher priced quotation warrant the additional price." *Id.* The agency evaluated three criteria: Technical Expertise, Risk Mitigation and Management, and Price. AR 58. Technical Expertise and Risk Mitigation and Management were equally important and both more important than Price. The importance of the price increased as the differences between the evaluation results for the other two criteria decreased, but it was not the controlling criterion in the selection.

The Army evaluated Technical Expertise "based on how well the quotation demonstrates a clear understanding of the requirements and deliverables, and on the Offeror's expressed ability to successfully perform." AR 40. Under Technical Expertise, the Army provided,

> While award of this task order will require the Offeror to perform all of the [Performance Work Statement] requirements, the Government considers the requirement in the following [Performance Work Statement] paragraphs to be critical to evaluation of the Offeror's technical expertise. Thus, these requirements must be specifically addressed in the quotation paragraphs: 2.1.5, 2.1.6, 2.2.1, 2.2.3, 2.2.5, 2.2.7, 2.2.8, 2.2.14, 2.3.2.

AR 41.

The Army's evaluation of Performance Work Statement ("PWS") critical requirements 2.1.5 and 2.1.6 are at issue here. PWS 2.1.5 provides:

> Provide technical expertise with respect to digital mission information exchange to facilitate/improve Command & Control [] and Situational Awareness [] among air and ground mission systems of Joint and Coalition forces. Provide technical expertise on Joint Battle Command-Platform [], Army Battle Command System [], Global Command & Control System [], , [sic] Blue Force Tracking [], Joint Variable Message Format [], Condition Based Maintenance [], Joint Technical Data Interface [], Future Avionics Capability Environment [], and digital data waveforms and networks such as Link-16 Tactical Digital

> Information Link- Joint [], Wideband Network Waveform [], Soldier Radio Waveform [], Warfighter Information Network-Tactical [], and Advanced Network Wideband Waveform [].

AR 23 (abbreviations omitted).

> PWS 2.1.6 provides:
>
> > Maintain direct and continuing technical liaison with other Government centers, laboratories, and other contractors. Provide technical expertise to conferences/briefings/meetings/working groups/teams such as on-site creation and delivery of high quality graphics and briefing material. The contractor shall participate in Technical Reviews, In Process Reviews [], Design Reviews, Program Reviews to include milestone decisions, System Engineering Reviews, and Technical Interchange Meetings []/Technical Exchange Meetings []. The contractor shall also provide technical support systems integration and network interoperability demonstrations such as the Army's Network Integration Evaluations [], Army Warfighting Assessments (AWAs), Army Expeditionary Warfighter Experiments [], and the Joint BOLD QUEST [] events.

*Id.*

> The agency evaluated Technical Expertise on a scale using "Outstanding," "Good," "Acceptable," and "Unacceptable" ratings. "Outstanding" means the quotation "meets requirements and indicates an exceptional level of expertise and an understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low." AR 41.
>
> The agency evaluated each offeror's Risk Mitigation and Management approach for "completeness, feasibility, and how well it addresses the details of the PWS." AR 42. The agency used five factors in this evaluation: (1) the ability to obtain and retain qualified personnel; (2) the ability to bring together the right team to perform the PWS requirements; (3) the ability to effectively manage the project; (4) Offeror's identification of significant anticipated technical or management risks and an effective plan for overcoming them; and

(5) Offeror's identification of any possible adverse impacts to existing program/projects. *Id*.

Under Risk Mitigation and Management, each offeror was rated "Outstanding," "Good," "Acceptable," or "Unacceptable." *Id*. "Outstanding" means the quotation "meets requirements and indicates an exceptional Risk Mitigation and Management approach. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low." *Id.* "Good" means the quotation "meets requirements and indicates a thorough Risk Mitigation and Management approach. Strengths outweigh any weaknesses. Risk of unsuccessful performance is low." *Id.* "Acceptable" means the quotation "meets requirements and indicates an adequate Risk Mitigation and Management approach. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is moderate." *Id.*

The agency evaluated price for "overall price reasonableness." AR 43. "Reasonableness means a fair and reasonable price; i.e., a price that a prudent businessperson would pay for an item or service under competitive market conditions, given a reasonable knowledge of the marketplace." *Id.* The Evaluation Criteria further stated:

> The proposed overall price will be evaluated to assess the level of effort and the mix of labor proposed to perform the tasks outlined in the PWS and to determine that the total price is reasonable. Offerors shall provide a written basis of estimate with the pricing volume to fully explain the basis for their estimated price.

*Id.*

The TORFQ instructed offerors in paragraph 5.b, "Pricing":

> For quotation preparation purposes, Offerors shall assume that the hours shall be distributed as follows:
>
> | | |
> |---|---|
> | (Base Period) Task Order Award through 12 months | 11% |
> | (Option Period) 13-24 Months | 16% |
> | (Option Period) 25-36 Months | 20% |
> | (Option Period) 37-48 Months | 24% |

      (Option Period) 49-60 Months                              29%

AR 58.

After details regarding how to quote price, the TORFQ instructed offerors in paragraph 6, "Labor Mix and Crosswalk": "Quotations shall include a labor mix and crosswalk spreadsheet. . . . The first tab of the spreadsheet shall include the Labor Mix. It shall list the labor categories and number of hours proposed for the base and any options periods."  AR 59.

Finally, the TORFQ in paragraph 9, "Historical Information—Provided for information only" gave a summary of the labor mix for the legacy requirement and explained:

> The PWS for the previous effort and the new effort are basically the same.  The labor mix for the final year of the current effort and the labor mix for the new effort are identical.  There is a decrease in overall required hours because one of the products previously managed by PD ANMP is now being managed by another office along with the associated contract services.

AR 61.

The historical information section continued, "The Government does not warrant that experience under the task order to be issued as a result of this TORFQ will be the same as under the previous task order." *Id.* The government's Independent Government Cost Estimate ("IGCE") of $12,492,460.05 took into account its assessment that the number of hours required would decrease as compared to the incumbent contract because one element of the prior work managed by PD ANMP had shifted to another office.  It estimated 89,270 hours to be required.

*Quantum's Quotation*

Quantum, the protestor, is the incumbent.  It has supported PD ANMP for more than fifteen years, providing engineering, system engineering, test, and technical support for communications, navigation, and mission planning systems.  Contrary to the TORFQ, Quantum proposed a yearly allocation of hours that were uniformly distributed over the base year and four option

periods, i.e., Quantum distributed 20% to each year. It quoted a total of 76,800 hours.

In its Technical Expertise section, Quantum addressed the PWS critical requirements 2.1.5 and 2.1.6 by providing "Team Quantum Expertise" in the form of one narrative block paragraph of experience for each PWS requirement. Relevant to this protest, Quantum addressed the Army Battle Command System in PWS 2.1.5 by stating, "We perform detailed coordination with Army Mission Command programs (formerly known as Army Battle Command System (ACBS)) . . . ." AR 72. Quantum did not include a reference to Global Command & Control System or Joint Technical Data Interface, both elements listed in PWS 2.1.5. AR 23.

Regarding its Risk Mitigation and Management plan, for its Task Order Lead, Quantum stated, "Mr. Corwyn Tiede will be the Task Order Lead and LNO for this effort. . . . Mr. Tiede has extensive aviation acquisition experience, and has supported PEO AVN in a contractor capacity since 2001. He currently provides on-site support . . . . Mr. Tiede will not be a Direct Labor Charge to the ANMP customer." AR 87. With respect to "Anticipated Technical and/or Management Risks," Quantum stated, "We reduced cost risk through the exclusion of the Task Order/Project Lead labor category (see Basis of Estimate (BOE)), and instead offer[] the services of a Quantum PM and Liaison Officer (LNO) at no charge to the government." AR 89–90.

In its Basis of Estimate, Quantum stated, "We are not proposing a Task Order/Project Lead. Historically, ANMP efforts and activities have not required the services of a full-time Task Order/Project Lead. As a Strength, Quantum will provide, at no cost to the government, the services of a Program Manager and Liaison Officer (LNO) . . . ." AR 99 (emphasis omitted). In its Basis of Estimate "Base Period & Transition" section, Quantum wrote, "PM (no charge), LNO (no charge)." AR 100.

*Army's Original Evaluation of Quantum*

Three technical evaluators (a lead engineer, a systems engineer, and a logistics management specialist) reviewed the non-price factors and assigned a rating for each factor. The Source Selection Authority then provided a summary of those evaluations in the best value determination, adopted the technical evaluators' ratings assignments, and performed the price evaluation and tradeoff discussion. Regarding Technical Expertise, the Army's technical

evaluators rated Quantum "Outstanding," assessing eighteen strengths, zero weaknesses, and zero deficiencies. The agency wrote, "Seven of the Offeror's assessed strengths related to a PWS paragraph that was previously identified as one of the critical requirements which must be addressed in the quotation." AR 400. In its detailed analysis, the Army addressed seven of the nine critical requirements and assigned ten strengths based on non-critical requirements.

The agency noted that Quantum's quotation demonstrated strong expertise and capabilities relating to PWS 2.1.5. The agency also noted that Quantum's quotation provided examples of experience that demonstrated capability to support the PD ANMP liaison with other Government centers in fulfillment of PWS 2.1.6. The agency did not discuss PWS critical requirements 2.2.1 or 2.2.14 in its evaluation of Quantum's Technical Expertise, nor did it mention that Quantum's response to PWS 2.1.5 did not reference Global Command & Control System or Joint Technical Data Interface. In summary, the Army wrote, "Risk of unsuccessful performance is very low." AR 402.

Under Risk Mitigation and Management, the Army rated Quantum "Good" and assessed it four strengths out of the five criteria, zero weaknesses, and zero deficiencies. AR 403–04. The agency discussed three of the criteria, determining that Quantum's strengths were (1) ability to obtain and retain qualified personnel, (2) ability to bring together the right team to perform the PWS requirements, and (4) identification of significant anticipated technical or management risks and an effective plan for overcoming the risk. *Id.*

The Army noted that "[t]he program manager's duties, however, will not be a direct labor charge to PD ANMP. Quantum instead proposes a Program Manager and Liaison Officer at no cost to the government." AR 404. The technical evaluators stated a concern that Quantum's quotation may thereby include gratuitous services that the Army could not accept. The agency concluded, however, "The Offeror's proposal satisfactorily addressed all the risk mitigation and management areas required." *Id.*

*Torch's Quotation*

In its quotation, Torch distributed its total of [          ] hours as provided in the TORFQ. In its Technical Expertise section, Torch addressed PWS 2.1.5 and 2.1.6 by providing two paragraphs addressing each. We provide an excerpt from these paragraphs here:

2.1.5 . . . The Torch Team has an extensive breadth of knowledge working with Command and Control systems supporting Army, Joint and Coalitions forces. We will use our expertise to translate operational requirements into digital mission information exchange requirements to improve IDM, AMPS, CFARS, ADEC, ACN, and NMCI support to aviation units' C2 capability. We will remain current with Department of Defense Information Technology Standards Registry [] and Common Operating Environment [] Standards Profile [] for Army C2 systems (such as: Joint Battle Command-Platform [], Global Command and Control System-Army (GCCS-A, Blue Force Tracker [] and Warfighter Information Network-Tactical []). . . .

Experience: Team Torch planned and implemented interoperability testing [                                    ] in preparation for Army Interoperability Certification (AIC) events, where we led troubleshooting efforts to correct identified errors. . . .

2.1.6 . . . Team Torch understands the critical nature of maintaining a strong liaison with the PM/Users of ANMP products, in order to ensure fielding priorities, product interoperability, and the realization of mission enhancements that ANMP provides. Team Torch will leverage our experience supporting numerous Aviation program and technical support offices [



] to maintain direct and continuing technical liaison with other Government centers, laboratories, and other contractors. . . . Our experienced Subject Matter Experts (SMEs), analysts, and engineers will follow the same or similar processes used to support [         ] organizations to support . . . Army Warfighting Assessments (AWAs) . . . .

Experience: Team Torch members have actively supported and participated in Technical Reviews for [

      ]

AR 237–39 (emphasis omitted).

Because it serves as the basis for one of Quantum's bid protest arguments, we note that Torch did not make a direct reference to Army Battle Command System in its explanation for how it was capable of meeting PWS 2.1.5.  Quantum also alleges that Torch did not sufficiently address Army Warfighting Assessments in PWS 2.1.6.

For Task Order Lead, Torch wrote in its Basis of Estimate,

    [




      ]

AR 268.

[



]

*Army's Original Evaluation of Torch*

Regarding Technical Expertise, the Army rated Torch "Outstanding," assessing it nineteen strengths, zero weaknesses, and zero deficiencies.  The agency wrote, "Six of the Offeror's assessed strengths related to a PWS

paragraph that was previously identified as one of the critical requirements which must be addressed in the quotation." AR 358. The agency's analysis listed seven of the critical requirements and it found that "[s]trengths far outweigh any weaknesses" for all seven. AR 350–58. For seven of the nine critical requirements, the Army dedicated one paragraph of analysis, but it did not address two of the critical requirements, including PWS 2.1.6.

Its analysis noted that Torch's quotation demonstrated strong expertise and capabilities relating to PWS 2.1.5, and the evaluation team did not appear concerned by the lack of reference to what Torch proposed with respect to Army Battle Command System. It assigned an additional twelve strengths based on non-critical requirements. The agency summarized Torch's risk of unsuccessful performance quotation the same as Quantum: "very low." AR 363.

Under Risk Mitigation and Management, the Army rated Torch "Outstanding" and assessed it four strengths out of the five criteria evaluated, zero weaknesses, and zero deficiencies. AR 366. The agency stated that Torch's strengths were (1) ability to obtain and retain qualified personnel, (2) ability to bring together the right team to perform the PWS requirements, (3) ability to manage the project effectively, and (4) identification of significant anticipated technical or management risks and an effective plan for overcoming the risk. AR 363–66. The agency concluded, "The Offeror's proposal satisfactorily addressed all the risk mitigation and management areas required." AR 366.

Regarding Task Order Lead, the Army noted that Torch proposed a Task Order Lead "providing program management interface to PD ANMP and oversight of assigned Torch personnel and corporate team members." AR 367. The task order lead had 31-years of experience as a government employee serving in technical leadership positions and had experience in relevant areas. In summary, the Army determined Torch's "[r]isk of unsuccessful performance is very low." *Id.*

*Agency's Original Best Value Determination*

11

In the initial best value determination, the Army's Source Selection Authority repeated the concern that Quantum's proposal of a Task Order Lead "will not be a direct labor charge to PD ANMP." AR 442. The agency noted that the Task Order Lead's extensive experience would be helpful, but that "[t]heir services, however, will be gratuitous and cannot be accepted." *Id.* The Army also observed that "it does not appear that Quantum makes any representation in their quotation as to how much support (how many hours) they can commit to provide for the Task Order/Project Lead requirement." AR 461. This was a "significant deviation from the past approach," and although the Army acknowledged that Quantum offered some explanation, it concluded that the explanation was "insufficient to overcome to potential impact to the program." *Id.*

The agency deemed each offeror's submitted price to be fair and reasonable. Quantum's price was $9,415,247.22. Torch's price was $10,216,335.22. The IGCE was $12,492,460.05.

The agency concluded that, although Torch's quoted price was 8% higher than Quantum's price, Torch posed less risk of unsuccessful performance. It noted that

> Quantum's total quoted labor hours of 76,800 is 14% less than the total IGCE labor hours of 89,270. One of the concerns is Quantum's understanding of the requirement. The fact that Quantum quoted 12,470 hours less than the IGCE could be interpreted to mean that Quantum does not understand the requirement as it pertains to the number of hours and the type of support required to successfully perform the requirement.

AR 454. The agency expressed concern that Quantum failed to convey how it would meet the Army's requirements while performing fewer hours, particularly when the IGCE took into account the reduced program effort.

Finally, the Army preferred Torch's labor mix approach [ 
]. The agency ultimately concluded that, although both offers were technically acceptable,

Torch's price, while somewhat higher, offered the best value because it represented less risk of non-performance.

On August 4, 2017, the Army made an award to Torch, prompting Quantum to file its first bid protest here on August 15, 2017, challenging the agency's evaluation of the Risk Mitigation and Management factor for both offerors. The agency notified the court that it would take corrective action and the protest was dismissed. Because Quantum had expressed no objections to its Technical Expertise rating, the Government re-evaluated only the Risk Mitigation and Management factor for both Torch and Quantum.

*Quantum's Reevaluation*

Upon reevaluation, the Army rated Quantum "Acceptable" for Risk Mitigation and Management, which was a downgrade from its original "Good" rating. Quantum received three strengths, one weakness, and zero deficiencies. AR 526–29. The agency again determined that Quantum's strengths were (1) ability to obtain and retain qualified personnel, (2) ability to bring together the right team to perform the PWS requirements, and (4) identification of significant anticipated technical or management risks and an effective plan for overcoming the risk. AR 526–27.

The Army determined that Quantum's weakness was in its ability to manage the project effectively: "Offerors were required to allocate total labor hours across the option and base years as follows: 11%, 16%, 20%, 24%, and 29% respectively (TORFQ 5.b)." AR 527. The agency noted that Quantum instead allocated its hours at a uniform 20% annually. It concluded that Quantum's "distribution of labor hours compromises task manning, surge capability and reach-back capability. These are integral to effectively managing the project." AR 527–28. The agency also reasoned that the total number of hours proposed, 76,800, particularly as uniformly allocated annually, did not allow "for an increase in hours over the option years. As a result, the Offeror will have insufficient hours to support PD ANMP mission critical requirements for option year 4 and potentially option year 3." AR 528.

The Army also repeated its concern that Quantum's proposal was ambiguous with respect to the Task Order Lead. It noted that "the Offeror

indicates there is no Task Order Lead," and later states that the Program Manager and the Liaison officer "will be provided at no charge." *Id.* The agency concluded that Quantum's quotation demonstrated ambiguity as to how Task Order Lead hours would be performed and billed. The agency thus assessed a "moderate risk that the Offeror will not be able to provide adequate support to PD ANMP." *Id.*

*Torch's Reevaluation*

Upon reevaluation of Torch's Risk Mitigation and Management, the Army once again rated it "Outstanding." Torch received four strengths, zero weaknesses, and zero deficiencies. The agency again determined that Torch's strengths were (1) ability to obtain and retain qualified personnel, (2) ability to bring together the right team to perform the PWS requirements, (3) ability effectively to manage the project, and (4) identification of significant anticipated technical or management risks and an effective plan for overcoming the risk. The agency determined that Torch "satisfactorily addressed all the risk mitigation and management areas required." AR 513.

In assessing Risk Mitigation and Management, the technical evaluators accepted Torch's Task Order Lead management proposal as capable of effectively managing the project. In its Basis of Estimate comments, the Army noted that Torch quoted [   ] hours, [
], and distributed those hours over the five years as specified in the TORFQ. The agency found Torch's labor mix reasonable and appropriate. The agency thus rated Quantum's risk of unsuccessful performance as "very low." AR 514.

*Agency's Best Value Determination Reevaluation*

The agency restated its Technical Expertise evaluation that both offerors were "Outstanding." It rated Quantum "Acceptable" and Torch "Outstanding" for Risk Mitigation and Management.

In its price evaluation, the Army set out the difference in quotations provided by each offeror and its comparison to the IGCE. (Quantum $9,415,247.22; Torch $10,216,335.22; IGCE $12,492,460.05. AR 565.) The

14

agency deemed both offerors' quotations fair and reasonable.

The Army also concluded that both offerors' composite labor rates were lower than the IGCE. Quantum's composite labor rate was $119.24 per hour. Torch's composite labor rate was [    ] and the IGCE was $137.05. AR 566. Torch's composite labor rate was [    ] less than Quantum's composite labor rate, despite its higher overall bid, because Torch quoted more hours.

The Army noted that Quantum quoted 14% fewer hours than the IGCE and that Quantum distributed its 76,800 hours equally across the base period and four option years, whereas the TORFQ allocation called for an annual increase of approximately 5%. The agency reasoned that the discrepancy in hours "raises several concerns." AR 567.

The Army's first expressed concern was that the 12,470-hour discrepancy between the government's estimate of the anticipated hours required and Quantum's quote meant that plaintiff did not understand "the number of hours and the type of support required to successfully perform the requirement." *Id.* Secondly, the agency noted that Quantum chose not to include "the Project Manager or Task Order Project Lead in its calculation of labor hours," thus reducing the number of labor hours in Quantum's quotation. This led to a concern that Quantum's allocation of hours evenly across each year meant that "Quantum may fail to provide adequate coverage for Option Years 3 and 4 of the Task Order." *Id.* The Army reasoned that Quantum did not adequately explain how it would achieve the efficiencies that its fewer-hours approach purportedly offered.

Ultimately, the Army determined that the two offerors had "essentially equivalent capabilities" under Technical Expertise, although Torch scored slightly better than Quantum in a few areas. AR 573. Under Risk Mitigation and Management, the Army did not have the same concerns with Torch as it did with Quantum. Specifically, Torch distributed its hours according to the instruction in the TORFQ, [

]

Moreover, the Army determined that "[b]ased on the advice of the technical team, it is clear that [                                                    ] to Quantum's stated approach, particularly without more explanation." AR 575. Thus athough Torch's price was higher than Quantum's, the Army determined Torch offered the best value. On January 31, 2018, the Army once again awarded the task order to Torch.

Quantum filed the pending bid protest on February 21, 2018.

DISCUSSION

This court has jurisdiction over challenges brought by interested parties to actions taken by federal agencies in connection with procurements. 28 U.S.C. § 1491(b)(1) (2012). We review agency action pursuant to the standards set forth in the Administrative Procedures Act, 5 U.S.C. § 706 (2012). *Id.* § 1491(b)(4). Thus, to prevail, the protester first must establish that the agency acted arbitrarily or capriciously, abused its discretion, or conducted itself in a manner that is otherwise not in accordance with law. 5 U.S.C. § 706. Even if a reasonable person might have reached a different conclusion than the agency, we will not set aside the agency's determination unless the protestor can demonstrate that the agency lacked a rational basis or violated law or regulation. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (citations omitted). If plaintiff clears the first hurdle, it must also "show that it was prejudiced by a significant error in the procurement process." *Labatt Food Servs., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009). In other words, plaintiff must show that, had it not been for the Army's error, "it would have had a substantial chance of securing the contract." *Id.*

Quantum alleges that the award to Torch was flawed for three reasons. First, it argues that the Army arbitrarily and in violation of the terms of the TORFQ applied the yearly percentage-of-hours allocation stated at AR 58 as a requirement rather than a suggestion. If it had not been penalized for deviating from the Army's annual allocation of hours, Quantum argues that it would have received an "Outstanding" rating for Risk Mitigation and Management. Second, Quantum contends that the Army arbitrarily allowed Torch to omit two components of the PWS critical requirements from its

quotation without being disqualified or assessed any weakness, leading to the Army's assessment that Torch offered outstanding Technical Expertise (an identical rating to Quantum). Finally, Quantum argues that the Army irrationally viewed Quantum's Task Order Lead proposal as a price risk and did not sufficiently analyze Torch's Task Order Lead proposal. Quantum alleges that absent any of these mistakes, Quantum would have been more favorably evaluated and thus would have had a substantial likelihood of being awarded the contract.

We consider the yearly percentage-of-hours allocation issue first. The TORFQ states in paragraph 5.b, "Pricing," "For quotation preparation purposes, Offerors *shall assume* that the hours *shall be distributed* as follows: 11% in the base period, 16% in the first option period, 20% in the second option period, 24% in the third option period, and 29% in the fourth option period." AR 58 (emphasis added). The plain language of this provision is that quotations must allocate hours to each year of the contract as listed. The Army is entitled to determine the level of effort it desires for each year of the contract and to instruct offerors to adhere to its determination so that it can uniformly evaluate offers.

Quantum does not cite any other provision of the TORFQ that modifies or negates this requirement. The PWS places the onus on the contractor to provide sufficient effort and resources to complete the required tasks. The Evaluation Criteria provides that price "will be evaluated to assess the level of effort and the mix of labor proposed to perform the tasks outlined in the PWS and to determine if the total price is reasonable." AR 43. Neither section indicates that offerors may propose a yearly percentage-of-hours allocation that differs from the distribution set out in the TORFQ.

The Army nevertheless evaluated Quantum's quotation on the merits, but explained why Quantum's allocation of hours (20% each year) posed the risk that Quantum would not be able to provide the anticipated amount of labor in option years three and four. This concern apparently factored heavily in the Army's tradeoff evaluation. Even though Quantum's price was lower than Torch's price overall, the Army remained concerned that Quantum would reach the later option years without the ability to provide the necessary amount of labor. Torch, on the other hand, quoted the anticipated number of hours and

spread those hours across the base and option years of the contract as anticipated by the Army. We find nothing irrational or arbitrary in this analysis.

The Army likewise did not abuse its discretion in its evaluation of Technical Expertise. The Evaluation Criteria instructed offerors to "specifically address" nine critical requirements, which included PWS 2.1.5 and 2.1.6. AR 41. The agency evaluated these critical requirements in its assessment of Technical Expertise. For Technical Expertise, the Army evaluated offerors "based on how well the quotation demonstrates a clear understanding of the requirements and deliverables, and on the Offeror's expressed ability to successfully perform." AR 40.

The Army's instructions to offerors did not state that an offeror had to address every component of the section by name or risk disqualification. The Army was apparently satisfied that Torch met the requirement to specifically address PWS 2.1.5 and 2.1.6 when it offered two narrative paragraphs discussing both sections, albeit without mentioning every single system listed in PWS 2.1.5. It treated Quantum in the same way.

The Army did not specifically address Torch's approach to PWS 2.1.6, but it did discuss nineteen PWS paragraphs individually, including seven of the nine critical requirements. The Army found in its assessment of Technical Expertise, moreover, that Torch had "experience as a technical liaison includ[ing] supporting numerous aviation program and technical support offices," and went on to list those offices. AR 507. The Army wrote that Torch's "plan is to leverage this experience to liaison with other Government centers, laboratories, and other contractors." *Id.* It concluded, "This architecture, requirements, networking and interoperability knowledge and experience related to PD ANMP systems demonstrates the Offerors capability to support PD ANMP requirements development and system development in a highly complex, interoperable networking environment." *Id.* Thus without specifically referencing PWS 2.1.6, the Army nevertheless addressed Torch's capability to do the work embraced by PWS 2.1.6. Ultimately, the Army reviewed both offerors' Technical Expertise in detail and provided a reasonable explanation of its assessment of both.

We note, in any event, that Quantum is in no position to complain. It omitted discussion of two elements of PWS 2.1.5, Global Command & Control System and Joint Technical Data Interface, from its quotation. If Torch's quotation were in fact ineligible for an "Outstanding" rating due to its omission, Quantum's would be as well.

Finally, we turn to Quantum's argument that the Army irrationally viewed Quantum's Task Order Lead proposal as a price risk and did not sufficiently analyze Torch's Task Order Lead proposal. The Army's IGCE stated that the Army anticipated the contract awardee would provide a Task Order Lead that would perform 11,520 hours. The TORFQ permitted offerors to propose their own mix of labor categories and hours for each type of labor. Both Quantum and Torch proposed a plan for Task Order Lead in its quotation.

Quantum proposed an experienced, on-site Task Order Lead but proposed to bill this individual as an indirect cost, i.e., as an element of built-in overhead. It refers to the Task Order Lead variously in its proposal as "no charge," "no direct charge," "no cost, and "indirect charge."

In its original evaluation, the Army expressed confusion regarding Quantum's Task Order Lead proposal, writing that it could not determine from Quantum's quotation whether the offeror intended its Task Order Lead to be an indirect cost or gratuitous service. The Army also expressed concern that Quantum's quotation did not provide a standard by which it could judge Quantum's Task Order Lead's work, because its quotation did not state how many hours the Task Order Lead would perform.

The Army's reevaluation of Quantum's Task Order Lead echoed those same concerns. It noted the indirect versus "no cost" ambiguity in Quantum's proposal. The Source Selection Authority also explained that Quantum had not provided enough details for the Army to determine how Quantum would achieve efficiencies through its Task Order Lead approach.

Torch ultimately quoted the Army [                                    ]. Unlike Quantum, it explained that its [

]

[                              ]. Torch also explained in its quotation [

]. The Army accepted this explanation and we are in no position to question it.

Quantum argues that the Army should have understood that its relatively low quotation for total hours—76,800—not as a risk but as a reflection of uncharged hours for its Task Order Lead. Quantum did not state in its quotation how many hours it anticipated its Task Order Lead would perform. Although Quantum contends that the Army should have understood that the delta between the number of hours in its quotation and the number of hours the Army anticipated was the amount of hours its Task Order Lead would perform, Quantum did not make that clear in its offer and it offers no proof from the record that this assertion is correct.

## CONCLUSION

In sum, the Army was entitled to, and did, require bidders to follow its determination of how hours were to be allocated over each year of the contract. By not following that directive, Quantum affected the Army's ability to determine whether Quantum would meet the Army's needs and how Quantum's quotation compared to others. Nor did the Army err in its Technical Expertise evaluation or in its assessment that Quantum posed a higher risk of non-performance. We therefore grant the government's and intervenor's cross-motions for judgment on the administrative record and deny plaintiff's motion. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge